**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| BELL HELICOPTER TEXTRON INC., | |
| Plaintiff, | |
| v. | No. 1:10-CV-789-RLW |
| EUROCOPTER, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF**
**BELL HELICOPTER TEXTRON INC.'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................................... 2

  A.   Procedural Background......................................................................................... 2

  B.   The '621 Patent ..................................................................................................... 4

  C.   The Production Gear .............................................................................................. 7

  D.   Eurocopter's Flawed Identification of the Skids of the Production Gear........................... 9

  E.   Eurocopter's Failure to Mark and Lack of Pre-Suit Notice ............................................. 10

III.   APPLICABLE LEGAL STANDARDS ................................................................... 11

  A.   Summary Judgment ............................................................................................. 11

  B.   Infringement......................................................................................................... 12

  C.   Marking................................................................................................................. 14

  D.   Injunctive Relief.................................................................................................. 15

IV.   ARGUMENT ............................................................................................................ 16

  A.   The Production Gear Does Not Infringe the '621 Patent..................................... 16

    1.   "Skids Compris[ing] a Front Comprising an Inclined Transition Zone" .................. 17

      a.   The Production Gear Does Not Include an "Inclined Transition Zone" at the "Front" of the Skids Under the Court's Constructions ....................................................... 17

      b.   Eurocopter's Assertion that the Production Gear Includes an "Inclined Transition Zone" at the "Front" of the Skids is Based on its Flawed Identification of the Skids...... 18

      c.   Eurocopter's Backup Doctrine of Equivalents Argument Also Cannot Defeat Summary Judgment ...................................................................................................... 24

    2.   "Inclined Transition Zone with Double Curvature" ................................................... 27

      a.   The Production Gear Does Not Include an "Inclined Transition Zone with Double Curvature" Under the Court's Constructions.................................................................... 27

      b.   There is No Equivalent of an "Inclined Transition Zone With Double Curvature" Even Under Eurocopter's Flawed Identification of the Skids .......................................... 27

    3.   "Integrated Front Cross-Piece".................................................................................. 31

      a.   The Production Gear Does Not Include an "Integrated Front Cross-Piece" Under the Court's Constructions .................................................................................................. 31

      b.   Eurocopter's Assertion that the Production Gear Includes the Claimed "Integrated Front Cross-Piece" is Based on its Flawed Identification of the Skids ............................ 32

    4.   "Offset With Respect to a Front Delimitation of a Plane of Contact of Each Said Longitudinal Support Stretch of Each of Said Skids" ...................................................... 33

      a.   The Front Cross-Piece of the Production Gear Does Not Satisfy the "Offset" Limitation Under the Court's Constructions.................................................................... 33

b.      Eurocopter's Assertion that the Production Gear's Front Cross-Piece Satisfies the "Offset" Limitation Is Contrary to the Court's Claim Construction................................. 34

c.      Eurocopter's Alternative Position that the Production Gear's Front Cross-Piece Satisfies the "Offset" Limitation Using the Proper Front Delimitation of a Plane of Contact Also Fails........................................................................................................... 36

B.   The Unasserted Claims are Not Infringed as a Matter of Law ......................................... 37

C.   Eurocopter is Barred from Recovering any Damages with Respect to the Production Gear for the Period Prior to the Filing of Its Infringement Counterclaim, and Cannot Recover any Damages with Respect to the Legacy Gear ............................................................................ 38

1.      Eurocopter Failed to Provide Notice to Bell Helicopter in Compliance With Section 287 Before This Action Began ............................................................................................ 38

2.      Eurocopter Is Barred From Recovering any Damages with Respect to Alleged Infringement by the Legacy Gear ...................................................................................... 39

D.   Summary Judgment Should Be Granted That Eurocopter is Not Entitled to Injunctive Relief With Respect to the Legacy Gear................................................................................... 41

V.   CONCLUSION............................................................................................................... 42

# TABLE OF AUTHORITIES

CASES

*Allan Block Corp. v. County Materials Corp.*,
  634 F. Supp. 2d 979 (D. Minn. 2008) ............................................................15, 42

*Am. Calcar Inc. v. Am. Honda Motor Co.*,
  651 F.3d 1318 (Fed. Cir. 2011) ...............................................................................36

*Amsted Indus. Inc. v. Buckeye Steel Castings Co.*,
  24 F.3d 178 (Fed. Cir. 1994) ...........................................................................14, 39

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) .................................................................................................11

*Barmag Barmer Maschinefabrik AG v. Murata Machinery, Ltd.*,
  731 F.2d 831 (Fed. Cir. 1984) .................................................................................11

*Bernardo Footwear, L.L.C. v. Fortune Dynamics, Inc.*,
  No. H-07-0963, 2008 WL 154461 (S.D. Tex. Jan. 15, 2008) .................................40

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
  320 F.3d 1339 (Fed. Cir. 2003) ...............................................................................13

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ...........................................................................................11, 38

*Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*,
  291 F.3d 1317 (Fed. Cir. 2002) ...............................................................................26

*Dunlap v. Schofield*,
  152 U.S. 244 (1894) .................................................................................................15

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
  363 F.3d 1263 (Fed. Cir. 2004) ............................................................12, 20, 24, 25

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .................................................................................................15

*Eli Lilly & Co. v. Barr Labs., Inc.*,
  251 F.3d 955 (Fed. Cir. 2001) .................................................................................11

*\*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*,
  265 F.3d 1311 (Fed. Cir. 2001) ....................................................................13, 25, 26

*Gentex Corp. v. Donnelly Corp.*,
  69 F.3d 527 (Fed. Cir. 1995) ...................................................................................14

*Glaxo Wellcome, Inc. v. Impax Labs., Inc.*,
  356 F.3d 1348 (Fed. Cir. 2004) ...............................................................................11

*Holdt v. A-1 Tool Corp.*,
  No. 04 C 4123, 2010 WL 1980101 (N.D. Ill. May 17, 2010) .................................39

*Johnson Worldwide Assocs. v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) .................................................................................12

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999)..........................................................................13

*Kahn v. General Motors Corp.*,
   135 F.3d 1472 (Fed. Cir. 1998)..........................................................................12

*\*L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*,
   499 F.3d 1303 (Fed. Cir. 2007).................................................................13, 29, 30

*Loops, LLC v. Phoenix Trading, Inc.*,
   No. C08-1064 RSM, 2010 WL 3041866 (W.D. Wash. Jul. 30, 2010)...................40

*Markman v. Westview Instruments Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) (*en banc*) ...............................................................12

*Moore U.S.A., Inc. v. Standard Register Co.*,
   229 F.3d 1091 (Fed. Cir. 2000)..........................................................................11

*Nichia Corp. v. Seoul Semiconductor, Ltd.*,
   No. 06-0162, 2008 WL 346416 (N.D. Cal. Feb. 7, 2008) ................................16, 42

*Respironics, Inc. v. Invacare Corp.*,
   No. 04-0336, 2008 WL 111983 (W.D. Pa. Jan. 8, 2008) ................................15, 42

*Retractable Technologies, Inc. v. Becton, Dickinson and Co.*,
   653 F.3d 1296 (Fed. Cir. 2011)..........................................................................30

*\*SafeTCare Mfg., Inc. v. Tele-Made, Inc.*,
   497 F.3d 1262 (Fed. Cir. 2007).................................................................13, 29, 30

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997)..........................................................................26

*Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*,
   400 F.3d 910 (Fed. Cir. 2005)............................................................................15

*Spectrum Int'l, Inc.* v. *Sterilite Corp.*,
   164 F.3d 1372 (Fed. Cir. 1998)..........................................................................12

*\*SRI Int'l v. Advanced Tech. Labs., Inc.*,
   127 F.3d 1462 (Fed. Cir. 1997)......................................................................14, 39

*Telemac Cellular Corp. v. Topp Telecom Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001)..........................................................................13

*\*Unicom Monitoring, LLC v. Cencom, Inc.*,
   No. 06-1166, 2013 WL 1704300 (D.N.J. Apr. 19, 2013).................................15, 42

*Union Carbide Corp. v. Am. Can Co.*,
   724 F.2d 1567 (Fed. Cir. 1984)..........................................................................11

*\*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*,
   520 U.S. 17 (1997)..............................................................................12, 13, 14

*White v. Dunbar*,
   119 U.S. 47 (1886)............................................................................................24

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
   904 F.2d 677 (Fed. Cir. 1990)......................................................................................13

*Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*,
   206 F.3d 1408 (Fed. Cir. 2000)...........................................................................13, 26

## STATUTES

35 U.S.C. § 271...............................................................................................................12

35 U.S.C. § 287........................................................................................................ passim

## OTHER AUTHORITIES

FED. R. CIV. P. 56(a) .......................................................................................................11

## I.        INTRODUCTION

Plaintiff Bell Helicopter Textron Inc. ("Bell Helicopter") respectfully requests that the

Court grant summary judgment that (1) the landing gear on Bell Helicopter's 429 helicopter (the

"Production Gear") does not infringe any claim of Eurocopter's asserted patent (U.S. Patent No.

5,860,621 ("the '621 Patent")), (2) Eurocopter is not entitled to pre-suit damages, (3) Euroocpter

is not entitled to any damages with respect to the original design of the landing gear (the "Legacy

Gear") and (4) Eurocopter is not entitled to an injunction against the Legacy Gear.  Such rulings

would entirely dispose of Eurocopter's claims.

Eurocopter concedes that the Production Gear does not literally infringe.  While

Eurocopter asserts infringement under the doctrine of equivalents, at least the following claim

limitations are not met: "each of said skids comprises a front comprising an inclined transition

zone with double curvature" and "an integrated front cross-piece offset with respect to a front

delimitation of a plane of contact of each said longitudinal support stretch of each of said skids."

The front of each skid is a ski tip, not an inclined transition zone with double curvature.

The front cross-piece is connected behind the front of the skids in the conventional manner

where descending branches of the cross-piece are connected via a saddle joint.  Eurocopter's

infringement contentions ignore the ski tip at the front of each skid.  Instead Eurocopter takes a

detour up the front cross-piece to identify the alleged front of the skid.  However, there can be no

genuine issue regarding what is the front of the skid: it has been defined as the portion in front of

the longitudinal support stretch, and that is where the aluminum tube that forms the skid ends in

a ski tip.

The Production Gear also does not have an "inclined transition zone with double

curvature."  Eurocopter argues that the saddle joint that connects the front cross-piece and the

skid is equivalent to a curvature that is part of the skid.  That argument is barred because it would

vitiate the distinction between a conventional saddle-joint connection and a curvature, which are distinguished in the specification of the '621 Patent.  The front cross-piece also is not integrated with the front of the skid because the front cross-piece is attached behind the front of the skid.  In addition, the front cross-piece is not offset with respect to a front delimitation of a plane of contact of each longitudinal support stretch of the skid because the front cross-piece crosses through the front delimitation of that plane of contact.  Eurocopter's expert does not even opine that the "integrated front cross-piece" and "offset" limitations are met under the doctrine of equivalents.

Accordingly, the Production Gear does not infringe.

Eurocopter is not entitled to pre-suit damages under 35 U.S.C. § 287 because Eurocopter contends that the '621 Patent was implemented in its EC120 and EC130 helicopters, but Eurocopter failed to mark it with the patent number or provide notice to Bell Helicopter prior to filing its infringement claim in this action.  This precludes Eurocopter from recovering even nominal damages for the Legacy Gear, which Bell Helicopter abandoned prior to Eurocopter's filing its infringement claim in this action and never used in any 429 helicopter that was sold. Eurocopter also is not entitled to injunctive relief against the Legacy Gear because Bell Helicopter is not reasonably capable of resuming its use—the Legacy Gear is not being manufactured and it is not certified by the Federal Aviation Administration (FAA).

## II.    FACTUAL BACKGROUND

### A.    Procedural Background

Bell Helicopter and Eurocopter are the world's largest distributors of commercial helicopters.  5/14/10 Complaint, D.I. 1, at 4 (¶ 17) (admitted in Eurocopter's 10/29/10 Answer and Counterclaim, D.I. 15, at 3 (¶ 17)).

Eurocopter asserts ownership of French Patent No. FR 96-07156 (the "French '156 Patent"), Canadian Patent No. 2,207,787 (the "Canadian '787 Patent") and the U.S. '621 Patent, all purporting to cover the same landing gear design (collectively, the "Landing Gear Patents"). Complaint at 4-5 (¶ 18) (admitted in Answer at 3 (¶ 18)).

The Landing Gear Patents are directed to helicopter landing gear with skids and integrated front cross-pieces, particularly for light helicopters.  Complaint at 4-5 (¶ 18).  On May 9, 2008, Eurocopter and Eurocopter Canada Limited sued Bell Helicopter Textron Canada Limited ("Bell Helicopter Canada"), alleging that the original landing gear design for the Bell 429 helicopter—the Legacy Gear—infringed the Canadian '787 Patent (the "Canadian Action"). Complaint at 5 (¶ 21) (admitted in Answer at 3 (¶ 21)).

Immediately following the institution of the Canadian Action, Bell Helicopter developed a new design for the Bell 429 landing gear—the Production Gear—to replace the Legacy Gear and placed the limited number of prototype Legacy Gears in quarantine.  Ex. 1, 3/14/13 Gardner Tr. at 73:22-76:11; *see also* Answer at 10 (¶ 15); Ex. 2, Canadian Opinion at 10 (¶ 22).[1]  Bell Helicopter obtained certification for the Production Gear's use on the Bell 429 from the relevant aviation authorities in Canada, the United States, and Europe in 2009.  Ex. 3, 1/21/11 Canadian Tr. Vol. 5 (Gardner) at 6:16-22.

No sales of the Bell 429 with the Legacy Gear were or could have been made because the helicopter was never certified with this gear.  Ex. 1, 3/14/13 Gardner Tr. at 73:22-74:8 (Legacy Gear never certified); 249:8-253:21 (same); 295:9-297:7 (Bell 429 could not be sold with potential alternative landing gear without first obtaining certification); Ex. 3, 1/21/11 Canadian

---

[1] Exhibits referenced herein are attached to the contemporaneously filed Declaration of Timothy J. Rousseau.

Tr. Vol. 5 (Gardner) at 5:20-6:22 (Bell 429 is only certified for use with Production Gear, and no helicopters have been sold with Legacy Gear which is not certified).

In June 2009, Eurocopter amended its pleading in the Canadian Action to assert that the Production Gear infringed.  Trial before the Canadian Federal Court occurred in January and February 2011.  The Canadian court found that the Production Gear did not satisfy at least three claim limitations and therefore did not infringe the Canadian '787 Patent.  Ex. 2, Canadian Opinion at 81-85 (¶¶ 251-63).  The Canadian court further found fifteen of the sixteen patent claims invalid.  *Id.* at 117 (¶ 371), 122 (¶ 386), 123 (¶¶ 391-93), 149 (¶ 2).  Lastly, the Canadian court found that the Legacy Gears in quarantine in Canada infringed.

On July 16, 2009, Eurocopter instituted an action for infringement of the French '156 Patent.  Ex. 4, French Summons at 1.  On October 11, 2012, the French court issued its Judgment in that action, and ruled that the Production Gear does not infringe the French '156 Patent.  Ex. 5, French Opinion at BELL0024549-50.  The French court dismissed Eurocopter's claim against the Legacy Gear because the Legacy Gear was never sold in France, nor could it have been offered for sale in France because it was never certified.  *Id*. at BELL0024548-49.  The French Court directed Eurocopter to pay the costs of the proceeding.  *Id*. at BELL0024551.

###     B.        The '621 Patent

Here Eurocopter alleges that the Legacy and Production Gears infringe claims 1-5, 9-10 and 15 of the '621 Patent.  Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 1-22.  The '621 Patent claims a landing gear design that allegedly provides certain advantages over conventional landing gear designs.  The '621 Patent states, "[c]onventional[] landing gears with skids principally comprise four elements: two cross-pieces connected to the airframe at the top and two skids for contact with the ground connected to the bottom parts of the cross-pieces."  Ex. 7, '621 Patent at 1:17-20.  According to the '621 Patent, U.S. Patent No. 2,641,423 ("the

'423 Patent") provides an example of a helicopter with a conventional landing gear.  *Id*. at 1:20-23.  The conventional skid landing gear of the '423 Patent is depicted below:



[Ex. 8, '423 Patent at Fig. 1]

The '423 Patent identifies the crosstubes of this conventional landing gear as elements 14 having "downwardly directed legs 18," and states that "at their lower ends the legs 18 connect as by means of fittings 20 [*i.e.,* saddle joints] to oppositely disposed skid devices 22."  Ex. 8, '423 Patent at 3:54-68.  The '423 Patent further makes clear that the skids—labeled element 22— include the front upturned ski tip labeled as element 24.  *Id*. at 3:68-72 ("Preferably, the front ends of the skids 22 are upturned as indicated at 24").  Thus, in conventional landing gear, there are two separate cross-pieces with descending branches that are connected to two skids by saddle joints, and the skids include upturned ski tips at the front.

The '621 Patent states that such conventional landing gear with "two skids for contact with the ground connected to the bottom parts of the cross-pieces" had a "major disadvantage" due to "the great rigidity of the system, which results in high acceleration factors during landings, difficult frequency adaptation, with respect to the phenomenon known as 'ground resonance', and a rather high landing gear weight."  Ex. 7, '621 Patent at 1:24-32.  The design of the alleged invention in the '621 Patent purportedly overcame these disadvantages by using a

front cross-piece which is integrated with the skids through the use of transition zones which are part of the skids.  *Id.* at 1:45-55.

Figure 1 of the '621 Patent depicts an embodiment of the alleged invention, where the front cross-piece 8 is integrated with the skids P through the transition zones T:



[Ex. 7, '621 Patent at Fig. 1]

Claim 1, the sole independent claim, reads as follows:

1.   Helicopter landing gear, comprising

a plurality of skids having a longitudinal support stretch for standing on ground and which are connected to a front cross-piece and a rear cross-piece for attachment to a structure of an aircraft by connecting devices,

the rear cross-piece being fixed by ends of descending branches to a rear part of each said longitudinal support stretch,

wherein each of said skids comprises a front comprising

an inclined transition zone with double curvature oriented transversely with respect to each said longitudinal support stretch to form together an integrated front cross-piece offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids.

*Id.* at 6:50-62 (internal line breaks added).

The Court set forth constructions for the terms that appear in claim 1:

| Claim Term | Court's Construction |
|---|---|
| a front | the portion of the skid forward of the longitudinal support stretch, *i.e.*, the portion of the skid that contacts the ground |

| Claim Term | Court's Construction |
|---|---|
| curvature | smooth bend |
| inclined transition zone | an inclined portion of a skid, with two separate areas of curvature, that transitions from the end of the longitudinal support stretch to the front cross-piece |
| integrated front cross-piece | a cross-piece whether made of a single part or of multiple components that is connected to the longitudinal support stretch by an inclined transition zone |
| offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids | The "front delimitation of a plane of contact" is the forward-most vertical plane at which the longitudinal support stretch of the skids contacts the surface of the ground. The front cross-piece is "offset with respect to a front delimitation of a plane of contact" if the front cross-piece does not intersect, or cross-through, the "front delimitation of a plane of contact." |

7/11/2012 Memorandum Opinion and Order, D.I. 50 at 16 (Appendix A).

### C.  The Production Gear

The Production Gear is illustrated below.  It does not have "skids compris[ing] a front comprising an inclined transition zone," "an inclined transition zone with double curvature," "an integrated front cross-piece," or a front cross-piece that is "offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids," as required by each claim of the '621 Patent.



[Ex. 9, Bell 429 Manual at BELL0011908]

Unlike the landing gear claimed in the '621 Patent, the Production Gear primarily comprises four separate and distinct pieces—a front cross-piece, a rear cross-piece, and two skids—and the descending branches of the rear cross-piece and front cross-piece are attached to the skids by saddle joints.  Ex. 9, Bell 429 Manual at BELL0011907; *see also id.* at BELL0011908, BELL0011913, BELL0011924, BELL0011939, BELL0011949.  This is the landing gear design described in the '621 Patent as "[c]onventional[]," and contrasted from the alleged invention.  *See* Ex. 7, '621 Patent at 1:17-23, 2:42-47, 6:35-39.

The following figure depicts the Production Gear with its saddle joint connections removed, to more clearly illustrate the four primary pieces of the Production Gear.



[Based on Ex. 9, Bell 429 Manual at BELL0011908]

The front and rear cross-pieces are depicted in green, and the skids are depicted in yellow and red, respectively illustrating the "front" and the "longitudinal support stretch" of the skids.  The "front" of the skid is "the portion of the skid forward of the longitudinal support stretch, *i.e.*, the portion of the skid that contacts the ground."  7/11/2012 Memorandum Opinion and Order, D.I. 50, at 9.  The "longitudinal support stretch" is "the portion of the skid that contacts the ground."  *Id.*

There can be no genuine dispute that all there is at the front of each skid in the Production Gear is an upturned ski tip with a single upward curve.  Ex. 9, Bell 429 Manual at BELL0011907-08; Ex 10, 5/31/13 Hodges Report at 46 (¶ 91).  There is no second curve, and the ski tip does not connect to or transition to anything.  *Id.*  The descending branches of the front cross-piece are connected to the longitudinal support stretches of the skids behind the front ski tip by saddle joints.  *Id.*

### D.      Eurocopter's Flawed Identification of the Skids of the Production Gear

Eurocopter concedes that the Production Gear does not literally infringe.  Ex. 11, 4/26/13 Logan Report at 70 (¶ 187); Ex. 12, Eurocopter's 2/28/13 RFA Responses at 7 (Response to RFA No. 5) ("Eurocopter admits that, under the Court's claim construction order, the Production Gear does not literally include a skid that satisfies all of the elements and limitations associated with the term 'skids.'").  However, to advance an argument under the doctrine of equivalents, Eurocopter contends that the skids of the Production Gear are not, in fact, the two distinct aluminum skid tubes identified above.  Rather, Eurocopter asserts that the skids take a detour up the front cross-piece, ignoring the ski tip at the front of the skid tubes, such that each skid includes part of the skid tube and part of the front cross-piece, as depicted in yellow below:



[Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 12]

Eurocopter asserts that, if the skids of the Production Gear were to include the portions in yellow, then each claim limitation which is not literally met is nevertheless satisfied under the doctrine of equivalents. *See* Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 12-17. As detailed below, Eurocopter's re-definition of the skids conflicts with this Court's claim constructions and could not be accepted by a reasonable jury.

### E.    Eurocopter's Failure to Mark and Lack of Pre-Suit Notice

Eurocopter asserts that two of its helicopters, the EC120 and EC130, include landing gear that is covered by the '621 Patent. *See* Eurocopter's 10/29/10 Answer and Counterclaim, D.I. 15, at 9 (¶7); Ex. 13, Eurocopter's 3/17/11 Interrogatory Responses at 7 (Response to Rog. No. 6); Ex. 14, Eurocopter's 2/28/13 Interrogatory Responses at 9-10 (Response to Rog. No. 22). Eurocopter has not, however, marked either helicopter with the '621 Patent number. *See* Ex. 15, Eurocopter's 11/30/12 Interrogatory Responses at 8 (First Supp. Response to Rog. No. 11 ("Eurocopter has not marked products with the patent number of the Patent-in-Suit.")).

Eurocopter did not provide actual notice of alleged infringement of the '621 Patent to Bell Helicopter until October 29, 2010, when Eurocopter filed its counterclaim for infringement in this action. Eurocopter's 10/29/10 Answer and Counterclaim, D.I. 15, at 11 (¶ 19); Ex. 16, Bell's 3/29/13 Interrogatory Responses at 73-74 (Second Sup. Response to Rog. 9).

Eurocopter has cited no evidence of Bell Helicopter making, using, selling or offering for sale any helicopters with a Legacy Gear in the United States since Bell Helicopter obtained certification for the Production Gear in Canada and the United States in June 2009. *See* Ex. 14, Eurocopter's 2/28/13 Interrogatory Responses at 8-9 (citing newsletters about Bell 429 from April 2008 and September 2007 (newsletters attached as Ex. 17 and Ex. 18 respectively)); Ex. 25, 6/5/13 Logan Tr. at 152:16-153:7 (conceding that Bell is not certified to sell helicopter with Legacy Gear and that he had not seen any sales document regarding Legacy Gear); 154:3-

10

157:13 (no alleged acts of infringement concerning Legacy Gear after 2009 certification); *see also* Ex. 3, 1/21/11 Canadian Tr. Vol. 5 (Gardner) at 5:20-6:22 (Bell 429 only certified for use with Production Gear and no helicopters have been sold with Legacy Gear, which is not certified); Ex. 1, 3/14/13 Gardner Tr. at 73:22-74:8 (Legacy Gear never certified), 249:8-253:21 (same), 295:9-297:7 (Bell 429 cannot be sold with potential alternative landing gear without first obtaining certification).

## III.    APPLICABLE LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment shall be granted when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The standard for summary judgment in a patent case is the same as in any other type of action.  *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1571 (Fed. Cir. 1984).  There is a genuine dispute about a material fact where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, if the facts and inferences, when viewed in the light most favorable to the nonmoving party, would not persuade a reasonable jury to return a verdict for the nonmoving party, then the moving party is entitled to summary judgment.  *Glaxo Wellcome, Inc. v. Impax Labs., Inc.*, 356 F.3d 1348, 1351 (Fed. Cir. 2004).  While the burden rests on the moving party to show that "there is an absence of evidence to support the non-moving party's case," the nonmoving party must affirmatively demonstrate, by specific factual allegations, that a genuine issue of material fact exists for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).

Notwithstanding that legitimate evidentiary inferences must be drawn in the non-movant's favor, Eurocopter cannot create a genuine issue of material fact merely by stating that a

fact is challenged.  *Barmag Barmer Maschinefabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 835-36 (Fed. Cir. 1984); *see also Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").  Moreover, "[e]ven disputed material facts will not defeat summary judgment when, taking all factual inferences in favor of the nonmovant, the moving party is nonetheless entitled to judgment as a matter of law."  *Spectrum Int'l, Inc.* v. *Sterilite Corp.*, 164 F.3d 1372, 1378 (Fed. Cir. 1998).  A disagreement by an expert that is nothing more than an unsupported conclusion is insufficient to raise a genuine issue of material fact.  *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1279 (Fed. Cir. 2004) (summary judgment of non-infringement was warranted where patentee's expert offered conclusory opinions of infringement "reached using words in ways that contradict their plain meaning").

## B.     Infringement

Infringement occurs where "whoever without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor."  35 U.S.C. § 271(a).  Determining whether a patent is infringed requires a two-step analysis: (1) construing the claims and (2) comparing the properly construed claims to the accused products.  *Markman v. Westview Instruments Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).

An accused product can be found to infringe a patent claim only where every claim limitation is found in the accused product, either literally or by an equivalent.  *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999).  The absence of a single limitation precludes a finding of literal infringement.  *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).

An accused product that does not literally infringe may still infringe under the doctrine of equivalents if each limitation which is not literally present in the accused product has an equivalent in the accused product. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). A claim limitation is not satisfied under the doctrine of equivalents if the differences between the alleged equivalent and the limitation are not "insubstantial" to one of skill in the art, or if the alleged equivalent does not "perform[] substantially the same function in substantially the same way to obtain the same result" as the claim limitation. *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir. 2003) (internal citations omitted).

There are limitations on the availability of the doctrine of equivalents. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1366-67 (Fed. Cir. 1999) ("the doctrine of equivalents is limited"). "These limitations on the doctrine of equivalents are questions of law." *Id.* at 1367. One legal bar to applying the doctrine of equivalents is that a patentee cannot show infringement through equivalence if a claim limitation would be ignored. *Warner-Jenkinson*, 520 U.S. at 29; *Telemac Cellular Corp. v. Topp Telecom Inc.*, 247 F.3d 1316, 1331 (Fed. Cir. 2001); *K-2 Corp.*, 191 F.3d at 1367. Accordingly, if application of the doctrine of equivalents would remove a "clear structural limitation" of a patent claim, summary judgment of noninfringement is appropriate. *Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1320-21 (Fed. Cir. 2001); *Zodiac Pool Care, Inc. v. Hoffinger Indus., Inc.*, 206 F.3d 1408, 1416 (Fed. Cir. 2000).

Summary judgment of no infringement under the doctrine of equivalents also is appropriate where a patentee has distinguished its invention over the prior art in the specification, and the alleged equivalent was used in the distinguished prior art. *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1270-71 (Fed. Cir. 2007); *L.B. Plastics, Inc. v. Amerimax*

*Home Prods., Inc.*, 499 F.3d 1303, 1309-10 (Fed. Cir. 2007).  In addition, a patentee cannot

allege infringement through the doctrine of equivalents to an extent that would encompass the

prior art.  *K-2 Corp.*, 191 F.3d at 1367; *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,

904 F.2d 677, 683-85 (Fed. Cir. 1990), *overruled in part on other grounds by Cardinal Chem.*

*Co. v. Morton Int'l*, 508 U.S. 83, 113 (1993).

      Although comparison of the claim to the accused product is an issue of fact, summary

judgment should be granted on that issue, like any other issue, when no reasonable jury could

find infringement.  *Warner-Jenkinson*, 520 U.S. at 39 n.8.  Accordingly, where a court

determines that a structure of the accused device does not meet a properly construed claim

limitation, summary judgment of noninfringement is appropriate.  *Gentex Corp.* v. *Donnelly*

*Corp.*, 69 F.3d 527, 530 (Fed. Cir. 1995).

### C.      Marking

      Pursuant to 35 U.S.C. § 287(a), a patentee that makes, uses, offers for sale, or sells within

the United States a patented article can give notice that the article is patented by marking the

article with the patent number.  "In the event of failure so to mark, no damages shall be

recovered by the patentee in any action for infringement, except on proof that the infringer was

notified of the infringement and continued to infringe thereafter, in which event damages may be

recovered only for infringement occurring after such notice.  Filing of an action for infringement

shall constitute such notice."  35 U.S.C. § 287(a).

      This "actual notice" requirement focuses on the actions of the patentee, and is only

accomplished when the patentee informs the accused infringer "of the identity of the patent and

the activity that is believed to be an infringement, accompanied by a proposal to abate the

infringement, whether by license or otherwise."  *SRI Int'l v. Advanced Tech. Labs., Inc.*, 127

F.3d 1462, 1470 (Fed. Cir. 1997); *see also Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24

F.3d 178, 187 (Fed. Cir. 1994) ("For purposes of section 287(a), notice must be of 'the infringement,' not merely notice of the patent's existence or ownership.  Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device. . . .  It is irrelevant . . . whether the defendant knew of the patent or knew of his own infringement.").

The patentee bears the burden of proving that it complied with § 287.  *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005) (citing *Dunlap v. Schofield*, 152 U.S. 244, 248 (1894)).

### D.   Injunctive Relief

"[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  One of those factors requires that a plaintiff demonstrate "that it has suffered an irreparable injury."  *Id.* The irreparable harm requirement for obtaining a permanent injunction cannot be satisfied in circumstances where the accused infringing product has never been sold, has not been manufactured in years, and the accused infringer is not reasonably capable of resuming its use. *See Unicom Monitoring, LLC v. Cencom, Inc.*, No. 06-1166, 2013 WL 1704300, at *10 (D.N.J. Apr. 19, 2013) (granting summary judgment of no injunction where "[t]here is no likelihood of irreparable harm demonstrated from the facts on the record [because] . . . [accused infringer] ceased using the infringing product as of 2010"); *Respironics, Inc. v. Invacare Corp.*, No. 04-0336, 2008 WL 111983, *2, *6 (W.D. Pa. Jan. 8, 2008) (denying permanent injunction where it had only been found that "a prototype device displayed at a trade show more than four years ago, but never sold at that time, or at any time thereafter, infringed" because "[a] device that no longer exists, and has been replaced by a different, currently commercialized model, cannot inflict harm"), *rev'd in part on other grounds*, 303 F. App'x 865 (Fed. Cir. 2008); *Allan Block*

*Corp. v. County Materials Corp.*, 634 F. Supp. 2d 979, 989-90 (D. Minn. 2008) (denying

injunction where plaintiff "has neither manufactured nor sold [the allegedly infringing] products

for years," and was "incapable of manufacturing additional [allegedly infringing] products");

*Nichia Corp. v. Seoul Semiconductor, Ltd.*, No. 06-0162, 2008 WL 346416, at *2 (N.D. Cal. Feb.

7, 2008) (denying permanent injunction where "it is undisputed that defendants no longer

manufacture the accused product, that defendants currently have no potential customers for such

product in the United States, and that, with the exception of [two sales occurring three years

prior], defendants have never sold the accused product to a customer in the United States").

## IV.   ARGUMENT

### A.   The Production Gear Does Not Infringe the '621 Patent

This Court's claim construction ruling, D.I. 50, construed several claim limitations to

require features that are not present in the Production Gear.  This should have ended any dispute

concerning infringement.  But instead of acknowledging this, Eurocopter has pressed forward

with a far-fetched infringement theory that no reasonable jury could accept.  In fact, as

demonstrated more fully below, Eurocopter's litigation-inspired reading of the elements of the

Production Gear even contradicts the testimony of two named inventors of the '621 Patent, as

well as its own expert's prior testimony.  While Eurocopter concedes that it cannot prove that the

Production Gear literally satisfies any claim of the '621 Patent, the doctrine of equivalents

cannot salvage Eurocopter's infringement theory.

Based on a proper reading of the structural features of the Production Gear, there can be

no genuine issue of material fact that the Production Gear does not have "skids compris[ing] a

front comprising an inclined transition zone," "an inclined transition zone with double

curvature," and "an integrated front cross-piece," and the front cross-piece is not "offset with

respect to a front delimitation of a plane of contact of each said longitudinal support stretch of

each of said skids"—either literally or under the doctrine of equivalents—as required by every claim of the '621 Patent.

      1.      **"Skids Compris[ing] a Front Comprising an Inclined Transition Zone"**

          a.      **The Production Gear Does Not Include an "Inclined Transition Zone" at the "Front" of the Skids Under the Court's Constructions**

There is no inclined transition zone at the front of the skids under the Court's constructions. The Court construed the term "front" to mean "the portion of the skid forward of the longitudinal support stretch, *i.e.*, the portion of the skid that contacts the ground." D.I. 50 at 9. Applying this construction, the front of each skid is a ski tip. Ex. 9, Bell 429 Manual at BELL0011907-08; Ex 10, 5/31/13 Hodges Report at 46 (¶91). The Court construed the term "inclined transition zone" as "an inclined portion of the skid, with two separate areas of curvature, that transitions from the end of the longitudinal support stretch to the front cross-piece." D.I. 50 at 13. However, as can be seen in the figure on the left below (with the saddle joints removed), the yellow ski tip at the front of each skid simply curves up.



      [Based on Ex. 9, Bell 429 Manual at        [Ex. 9, Bell 429 Manual at BELL0011908]
              BELL0011908]

The required second area of curvature is absent, and the ski tip does not transition into the green front cross-piece—the ski tip does not transition into anything. Ex. 9, Bell 429 Manual at

BELL0011907-08; Ex 10, 5/31/13 Hodges Report at 46 (¶91).  As shown in the figure on the right, the front cross-piece is connected behind the front of the skid, along the longitudinal support stretch, by saddle joints.

Accordingly, the Production Gear does not include "skids compris[ing] a front comprising an inclined transition zone" as required by each of the claims of the '621 Patent.

> **b.**    **Eurocopter's Assertion that the Production Gear Includes an "Inclined Transition Zone" at the "Front" of the Skids is Based on its Flawed Identification of the Skids**

While Eurocopter concedes that there is no literal infringement, the only element Eurocopter contends is not literally met is the lower curvature, which, as detailed below, Eurocopter contends is satisfied under the doctrine of equivalents.  To advance its position, Eurocopter is forced to identify the skids in a manner no reasonable jury could accept.

The Court construed the term "a front" as "the portion of the skid forward of the longitudinal support stretch, *i.e.*, the portion of the skid that contacts the ground."  D.I. 50 at 16. However, Eurocopter ignores the ski tip, which is the portion of the skid forward of the portion of the skid that contacts the ground.  Since the Court's construction requires the "front" of the skid to be forward of the longitudinal support stretch and the "inclined transition zone must also begin forward of the longitudinal support stretch," D.I. 50 at 8-9, 11, Eurocopter has attempted to meet the Court's constructions by re-defining the skid.

Rather than acknowledge that the skids are the skid tubes that end at the front in ski tips, Eurocopter takes the absurd position that the skid takes a detour before reaching the ski tips, up the saddle joints and ends somewhere along the front crosstube.  Eurocopter colored what it deems the skids in yellow in the figure below:



[Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 12].

Eurocopter's expert, Mr. Logan, also opined that the skids are the portions identified in yellow above. Ex. 11, 4/26/13 Logan Report at 63, 69 (¶¶ 177, 184). According to Eurocopter and Mr. Logan, if the skids of the Production Gear include the portions in yellow, then there is an inclined transition zone at the "front" of the skids. *See* Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 12-17; Ex. 11, 4/26/13 Logan Report at 63-79 (¶¶ 176-201).

Simply put, Eurocopter and Mr. Logan are wrong because the skid is the component that rests on the ground and ends at the front in a ski tip, and no reasonable jury could find otherwise. Eurocopter's position that one must take a detour up the front cross-piece to find the front of the skid must be rejected, and cannot avoid summary judgment.

There was never any dispute as to what constitutes the skid—it is the tube that lies on the ground. Eurocopter did not request construction of this term. Eurocopter has simply decided to unilaterally re-define the skid, contrary to the Court's constructions and any reasonable understanding of what the skid is, to try to maintain an infringement position. This is blatantly a litigation-induced response to the Court's constructions which ignores the reality that the skid is the tube that contacts on the ground.

Eurocopter's specious re-definition of the skids cannot raise a genuine issue of material fact because it is a conclusory, litigation-induced position that conflicts with the plain meaning

of the term "skid" and is devoid of evidentiary support. *Dynacore*, 363 F.3d at 1279 (summary judgment of non-infringement was warranted where patentee's expert offered conclusory opinions of infringement "reached using words in ways that contradict their plain meaning"). No reasonable jury could accept Eurocopter's unsupported attempt to re-define the skid—in conflict with the plain meaning of that term—as part of that tube, part of the saddle joint, and part of the front crosstube. *Id.*

Moreover, Eurocopter's new infringement theory directly contradicts the evidence from its own witnesses. Two named inventors of the '621 Patent contradicted Eurocopter's new infringement position. Mr. Lacroix, a named inventor of the '621 Patent and Eurocopter 30(b)(6) designee, was shown the following photograph of a model of the Production Gear.



[Ex. 20, Exhibit 17 to 1/24/13 Lacroix Deposition]

Mr. Lacroix testified that "if you were to take apart the pieces, the parts in yellow and blue would be called the skid." Ex. 19, 1/24/13 Lacroix Tr. at 174:3-175:3. He further testified that the portions in white comprise the cross-pieces and the areas of attachment between the cross-pieces and the skids. *Id*. at 175:5-9. He identified the front and rear saddle joints as the areas of attachment between the skid and the cross-pieces by circling them in black ink. *Id*. at 175:10-176:1; Ex. 20, Exhibit 17 to 1/24/13 Lacroix Deposition.

Mr. Mairou, another named inventor, also identified the Production Gear's components in a manner that belies Eurocopter's new infringement position.  Specifically, he was shown a drawing of a Production Gear, and asked to shade the skid in blue and the front cross-piece in pink.  *See* Ex. 21, 2/7/13 Mairou Tr. at 98:8-14; 106:3-5; 106:15-107:14.  As shown below, Mr. Mairou shaded the entire front cross-piece in pink, ***including its descending branches***, contrary to Eurocopter's and Mr. Logan's unsupported assertion that those descending branches should be considered part of the skid.  *Id.*; Ex. 22, Exhibit 11 to 2/7/13 Mairou Deposition, at BELL0011908.



[Excerpt from Ex. 22, Exhibit 11 to 2/7/13 Mairou Deposition at BELL0011908]

Furthermore, Mr. Logan's testimony about the Production Gear in the prior Canadian Action directly contradicts his new opinions in this case.  In his expert report in the Canadian Action, Mr. Logan opined that the front cross-piece is attached to the skids by saddle joints, thus recognizing that the entirety of the front crosstube is the front cross-piece:

> Since ***the saddle is firmly attached to the skid and the crosspiece is firmly attached to the saddle***, they form one continuous piece composed of three sections. . . .  The general configuration of the [Production] Landing Gear is very similar to that of the landing gear described in the '787 patent since ***the front cross piece is inclined and firmly connected to the skid (albeit with a saddle)***.

Ex. 23, 8/31/10 Logan Canadian Expert Report at 79-80 (emphasis added).  Mr. Logan also

recognized during his testimony in the Canadian Action that the skid is the tube that lies along

the ground, and is connected by a saddle joint to a different component—the forward crosstube:

> One is the addition of ***a saddle at the lower-end of the forward crosstube as it
> mates to the skid***.  You see that the skid itself is lengthened somewhat to
> accommodate a short ski forward of the saddle location.

Ex. 24, 1/26/11 Canadian Tr. Vol. 8 (Logan) at 113:14-18 (emphasis added).

Perhaps the most striking example of the complete lack of support for Mr. Logan's

results-oriented reading of the skids is that when he was asked to identify the "front" of the

Production Gear's skids on the following schematic during his deposition in this case, ***he circled

the ski tip in front of the longitudinal support stretch***:



[Ex. 26, Exhibit 1 to 6/5/13 Logan Deposition at BELL0032767]

Ex. 25, 6/5/13 Logan Tr. at 9:6-12:6 (identifying "front" of skid in BELL0032767); 23:16-22

("The definition of the skid that I'm using in Logan 1 . . . is, in the absence of any other

guidance, a traditional acceptable definition of a skid.  It's the long tube that sits on the ground,

and it has a little ski tip in the front.  That's very consistent with conventional skid landing

gear.").  Mr. Logan conceded that a person skilled in the field would traditionally identify the

entire structure shown in the above figure, including the ski tip, as the skid.  *Id*. at 15:3-16:1.

Yet when shown the following schematic of the entire Production Gear, Mr. Logan

contended that the ski tip was no longer the front of the skid.  Ex. 25, 6/5/13 Logan Tr. at 12:20-

14:18.  Instead, he reverted to his conclusory identification of the skids as taking a detour up the

descending branches of the front cross-piece (*id*. at 28:5-29:11, 35:10-36:8), notwithstanding that

he also conceded that the descending branches of the front crosstube end within the saddle joints,

as he indicated in red ink.  *Id*. at 37:5-39:15.



[Ex. 27, Exhibit 2 to 6/5/13 Logan Deposition at BELL0032773]

Mr. Logan provided no factual explanation as to how the front of the same skid could possibly

change between the two schematics, but rather conceded that he had decided to "construct a

skid" out of different components.  *Id*. at 23:4-7 ("I've gone through the claim construction and

looked at the way the claim construction describes the skid, what parts are in it, and then used the

Court's definitions of those parts to construct a skid"); *see also id*. at 90:19-93:3.  Mr. Logan's

attempt to "construct a skid" is a conclusory, litigation-induced position for purposes of trying to

maintain an infringement position where no reasonable position exists.  The skid is the skid tube; the term "skid" is not a "nose of wax" to be contorted to suit Eurocopter's desires.  *White v. Dunbar*, 119 U.S. 47, 51-52 (1886) ("Some persons seem to suppose that a claim in a patent is like a nose of wax which may be turned and twisted in any direction . . . so as to make it include something more than, or something different from, what its words express.  The claim is a statutory requirement, prescribed for the very purpose of making the patentee define precisely what his invention is; and it is unjust to the public, as well as an evasion of the law, to construe it in a manner different from the plain import of its terms.").

Eurocopter's infringement theory based on Mr. Logan's new opinions about constructing a skid in this case does not raise a genuine issue of material fact, and thus cannot avoid summary judgment.  *See Dynacore*, 363 F.3d at 1278 (summary judgment of non-infringement was warranted where patentee's expert offered conclusory opinions of infringement "reached using words in ways that contradict their plain meaning").

> c.     **Eurocopter's Backup Doctrine of Equivalents Argument Also Cannot Defeat Summary Judgment**

While Mr. Logan's primary position is that the front of the skid does not include the ski tip, he offers conclusory testimony in a single paragraph of his expert report under the assumption that the front of the skid includes the ski tip.  Mr. Logan opines that even though the alleged inclined transition zone is behind the front of the skids, "the difference between an inclined transition zone that begins at the 'front' and one that begins extremely close to the 'front' is insubstantial, and has no impact on the resulting properties of the gear."  Ex. 11, 4/26/13 Logan Report at 78-79 (¶ 200).  However, Mr. Logan provides *no* analysis as to how an inclined transition zone that begins behind the "front" of the skid can somehow be equivalent to

one that begins at the front of the skid. *Id.* Eurocopter also did not disclose this theory in its infringement contentions. *See* Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 15.

Because Mr. Logan's opinion on this issue is conclusory and Eurocopter has provided no competent evidence that this limitation can be satisfied through the doctrine of equivalents, summary judgment of noninfringement is proper. *See Dynacore*, 363 F.3d at 1278.

Moreover, Mr. Logan's position must be rejected as a matter of law because it is prohibited by the Court's claim constructions. The Court specifically held that the "front" of the skid is a "specific structural component of the skid" that is a "separate element from the longitudinal support stretch." D.I. 50 at 8. The Court explained, "'a front' cannot be part of the longitudinal support stretch;" the "front" of the skid "must . . . be forward of the longitudinal support stretch." *Id.* Mr. Logan concedes that the region of the skid he identifies as part of the front of the skid under the doctrine of equivalents is actually part of the longitudinal support stretch. As shown by his diagram below, the saddle joint that he alleges to be the start of the inclined transition zone is within the longitudinal support stretch, which he designated using the phrase "plane of contact":



[Ex. 11, 4/26/13 Logan Report at 79]

Thus, Mr. Logan's proposed doctrine of equivalents argument conflates the front of the skid with the longitudinal support stretch, and must fail "because applying the doctrine to find infringement in this case would improperly read [the "front"] limitation[] out of [the asserted] claim[s]." *Fin Control*, 265 F.3d at 1320-21. In *Fin Control*, the Federal Circuit affirmed

summary judgment of no infringement where the asserted claim required a fin to be attached to a surfboard through a releasable means that "laterally" engaged the fin by applying a "lateral force," but the accused surfboard fixed its fin to the board by a screw mechanism mounted in the front of the fin.  *Id.*  The Court explained that a frontal force is not a force from the side, and therefore the doctrine of equivalents theory would improperly read out the lateral limitation.  *Id.*[2]

Eurocopter and Mr. Logan cannot erase the clear structural limitation "a front comprising an inclined transition zone" by resorting to the doctrine of equivalents, since this would eviscerate the distinction between the longitudinal support stretch and the front of the skid. *Zodiac Pool Care*, 206 F.3d at 1416 ("[where] patent contains 'clear structural limitations,' including a limitation that the stop be located 'substantially inward' of the peripheral edge of the disc . . . a verdict of infringement under the [doctrine of equivalents] would reduce the claims to nothing more than 'functional abstracts, devoid of meaningful structural limitations on which the public could rely'" (internal citations omitted)).  Accordingly, Eurocopter's backup position also fails as a matter of law, and summary judgment of noninfringement is warranted.

---

[2] *See also Cooper Cameron Corp. v. Kvaerner Oilfield Prods., Inc.*, 291 F.3d 1317, 1321-22 (Fed. Cir. 2002) (affirming summary judgment of no infringement under doctrine of equivalents where the claim required a workover port to be located "between" two plugs and accused product had its workover port located "above" the plug, because to do so would improperly vitiate the "between" limitation); *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1424-26 (Fed. Cir. 1997) (affirming summary judgment of noninfringement under doctrine of equivalents where accused product contained an elongated slot within container, rather than "at the top of the container" as claimed and application of doctrine of equivalents would "remove entirely the 'top of the container' limitation[] from the claim").

2. **"Inclined Transition Zone with Double Curvature"**

    a. **The Production Gear Does Not Include an "Inclined Transition Zone with Double Curvature" Under the Court's Constructions**

The Court construed the term "inclined transition zone" as "an inclined portion of the skid, with two separate areas of curvature, that transitions from the end of the longitudinal support stretch to the front cross-piece." D.I. 50 at 13. The Court further construed the term "curvature" as "a smooth bend." *Id*. at 10. Under the proper reading of the relevant features of the Production Gear, there is no front of a skid having an inclined transition zone whatsoever, let alone one with double curvature. On the Production Gear there is only a ski tip that does not transition into anything and only has one upward curvature. Ex. 9, Bell 429 Manual at BELL0011907-08; Ex 10, 5/31/13 Hodges Report at 46 (¶ 91).

    b. **There is No Equivalent of an "Inclined Transition Zone With Double Curvature" Even Under Eurocopter's Flawed Identification of the Skids**

By improperly excluding the ski tip in favor of including a portion of the front crosstube in the alleged skid, Eurocopter asserts that the inclined transition zone with double curvature at the front of each skid begins at the saddle joint. According to Eurocopter, the inclined transition zone of the Production Gear is the portion between the dashed lines in the figure below, beginning at the bottom of the front saddle joint connection and continuing up through the descending branch of the front crosstube:



[Ex. 11, 4/26/13 Logan Report at 70]

Eurocopter concedes that the saddle joint does not literally have a "curvature," but contends that it is equivalent to a curvature.  Ex. 11, 4/26/13 Logan Report at 70 (¶ 187).

The Court need not reach this argument if the Court rejects Eurocopter's improper identification of the skids; regardless, Eurocopter's argument that the saddle joint is equivalent to a curvature also fails.  The doctrine of equivalents cannot be used to expand the scope of the claimed curvature to attachment by a saddle joint because the specification of the '621 Patent expressly distinguished the claimed inclined transition zone with double curvature from such conventional coupling attachments.

The '621 Patent discloses that the rear cross-piece "can be connected in a conventional manner to the rear section of the longitudinal support stretches," Ex. 7, '621 Patent at 2:42-44, such that the skids are "connected to the bottom parts of the cross-pieces," *id.* at 1:20, and "the ends of the descending branches of the rear cross-piece [are] fixed to the said longitudinal support stretches of the skids by the intermediary of aluminum coupling pieces," *id.* at 2:43-47. The '621 Patent makes clear that the front cross-piece is attached in the same manner in conventional landing gear, and contrasts this with the structure of the alleged invention.  *Id.* at 6:35-40 ("FIGS. 12 and 13 make it possible to compare the behaviour of landing gear with an integrated front cross-piece 8 according to the invention (FIG. 13) with that of conventional

28

landing gear (FIG. 12) with a front cross-piece which is attached in the same way as the rear cross-piece."). Citing this portion of the specification, the Court expressly recognized this distinction in its claim construction order: "[T]he specification distinguishes the integrated front cross-piece from a conventional landing gear with a front cross-piece which is attached in the same way as the rear cross-piece." D.I. 50 at 15. This Court concluded therefore that, "in the claimed invention, the front cross-piece is not attached to the longitudinal support stretch in the same way as the rear cross-piece." *Id*.

Nevertheless, Eurocopter improperly argues that use of a conventional saddle joint attachment, which was distinguished in the specification, is equivalent to the claimed curvature. This cannot avoid summary judgment. Summary judgment of no infringement under the doctrine of equivalents is appropriate where, as here, a patentee has distinguished its invention over the prior art in the specification, and the accused product includes the distinguished feature. *L.B. Plastics, Inc. v. Amerimax Home Prods., Inc.*, 499 F.3d 1303, 1309-10 (Fed. Cir. 2007); *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1270-71 (Fed. Cir. 2007).

In *SafeTCare*, the Federal Circuit affirmed summary judgment of no infringement under the doctrine of equivalents where a claim required a plurality of motors to exert a "pushing force" on a bed frame component to cause a portion of the bed to adjust upwardly, in view of the fact that in the specification the inventor had distinguished prior art adjustable beds that used electric motors to "pull" a component of the frame for upward adjustment. 497 F.3d at 1270-71. The specification stated that it was "an important feature of the present invention" that the motor applied "pushing forces" to the frame components "in contrast to conventional bedframes" where motors exerted a pulling force against the frame. *Id*. at 1270 (emphasis in original). Use of a pulling force therefore could not be considered equivalent to the claimed pushing force:

> [T]he written description repeatedly emphasizes that the motor of the patented invention applies a pushing force, not a pulling force, against the *lift dog*.  The inventor makes clear that this attribute of the invention is important in distinguishing the invention over the prior art.  Thus, we are persuaded by the language used by the patentee that the invention disclaims motors that use pulling forces against lift dogs.

*Id*. (emphasis in original).

Similarly, in *L.B. Plastics*, the Federal Circuit affirmed summary judgment of no infringement under the doctrine of equivalents where the patentee had distinguished the claimed attachment means from the attachment means in the prior art.  499 F.3d at 1309-10.  The Federal Circuit noted that "since the patentee elected to distinguish prior art attachment means and to limit its claim to continuous welded attachments, a person of ordinary skill in the field of the invention reading the specification would clearly conclude that the inventor thought that adhesive attachments generally were undesirable."  *Id*. at 1310.  The Federal Circuit concluded that "[u]nder these circumstances [the patentee] cannot now use the doctrine of equivalents to include adhesive attachments."  *Id*.

Here, the descending branches of the front cross-piece of the Production Gear are attached to the respective skids by saddle joint attachments at a point behind the front of the skid, just as in the prior art conventional gear distinguished in the specification.  Accordingly, Eurocopter cannot establish that the Production Gear has an inclined transition zone with double curvature, and summary judgment of noninfringement is proper.  *SafeTCare*, 497 F.3d at 1270-71; *L.B. Plastics*, 499 F.3d at 1309-10; *see also Retractable Technologies, Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296, 1307 (Fed. Cir. 2011) ("[S]tatements in the specifications preclude [patentee] from asserting that a body constructed of two pieces infringes the asserted claims under the doctrine of equivalents . . . [where] the specifications expressly recite that 'the invention' has a body constructed as a single piece and expressly distinguish the invention from

the prior art based on this feature.  With these distinguishing statements in the specifications,

[patentee] cannot use the doctrine of equivalents to claim subject matter that the specifications

expressly state fall outside the invention.").

      **3.**      **"Integrated Front Cross-Piece"**

         **a.**      **The Production Gear Does Not Include an "Integrated Front Cross-Piece" Under the Court's Constructions**

Claim 1 requires each skid to have "a front comprising an inclined transition zone with

double curvature oriented transversely with respect to each said longitudinal support stretch to

form together an integrated front cross-piece."  The Court construed the term "integrated front

cross-piece" as "a cross-piece whether made of a single part or of multiple components that is

connected to the longitudinal support stretch by an inclined transition zone."  D.I. 50 at 15.  The

Court further construed the term "inclined transition zone" as "an inclined portion of the skid,

with two separate areas of curvature, that transitions from the end of the longitudinal support

stretch to the front cross-piece."  *Id.* at 13.  Thus, under the Court's constructions, the front of the

skid must form an integrated front cross-piece by transitioning to the front cross-piece through an

inclined transition zone.

However, since the front of each skid in the Production Gear is a ski tip and does not

transition into anything, there is no "integrated front cross-piece."  The front cross-piece is

attached rearward of the ski tip, along the longitudinal support stretch, by a saddle joint.  Ex. 9,

Bell 429 Manual at BELL0011907-08; Ex 10, 5/31/13 Hodges Report at 56 (¶111).  The front

cross-piece is not integrated with the front of the skid.

**b.     Eurocopter's Assertion that the Production Gear Includes the Claimed "Integrated Front Cross-Piece" is Based on its Flawed Identification of the Skids**

Eurocopter contends that there is literally an "integrated front cross-piece" based on its improper identification of the skid as including part of the front crosstube, as shown in yellow below.  Eurocopter contends that the only portion of the front crosstube that constitutes the claimed front cross-piece is the portion shown in red below.



[Ex. 11, 4/26/13 Logan Report at 77]

For the reasons explained in Section IV.A.1.b above, Eurocopter and Mr. Logan's litigation-inspired re-definition of the skids cannot raise a genuine issue of material fact.  Once Eurocopter's improper identification of the skids is rejected, Eurocopter is left with no argument that there is an "integrated front cross-piece."  This limitation is not literally met because the front-cross-piece is not integrated with the ski tips, and Eurocopter's expert conceded that he offered no opinions that this limitation is met under the doctrine of equivalents.  Ex. 11, 4/26/13 Logan Report at 69-79 (¶¶185-200) (only alleging equivalents concerning "curvature" and "front"); Ex. 25, 6/5/13 Logan Tr. at 121:3-7.

Regardless, as explained in Section IV.A.2.b above, the doctrine of equivalents cannot expand the scope of the claims to cover a landing gear having a front cross-piece connected to a skid by a saddle joint behind the front of the skid along the longitudinal support stretch.  As previously discussed, the specification of the '621 Patent expressly distinguishes the integrated

front cross-piece of the alleged invention from a front cross-piece attached using saddle joints in conventional landing gear.  Furthermore, the claims themselves distinguish between the attachment of the rear cross-piece, which is "fixed by ends of descending branches," from the "integrated front cross-piece."  In the Production Gear, the front cross-piece is fixed to the skids by the ends of descending branches, not integrated with the front of the skids as the claims require.

### 4. "Offset With Respect to a Front Delimitation of a Plane of Contact of Each Said Longitudinal Support Stretch of Each of Said Skids"

#### a. The Front Cross-Piece of the Production Gear Does Not Satisfy the "Offset" Limitation Under the Court's Constructions

The claims of the '621 Patent require that the integrated front cross-piece be "offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids."  The parties agreed that the term "offset with respect to a front delimitation of a plane of contact of each said longitudinal support stretch of each of said skids" means:

> The "front delimitation of a plane of contact" is the forward-most vertical plane at which the longitudinal support stretch of the skids contacts the surface of the ground.  The front cross-piece is "offset with respect to a front delimitation of a plane of contact" if the front cross-piece does not intersect, or cross through, the "front delimitation of a plane of contact."

D.I. 50 at 5, 16.  The Court adopted that construction.  *Id.*

In the Production Gear, the front cross-piece, shaded in blue below, ***intersects, or crosses through***, the front delimitation of the plane of contact, shown as the orange line below.



[Based on Ex. 28, EC-DC 0004905]

Ex 10, 5/31/13 Hodges Report at 57-58 (¶¶ 114-15).  Indeed, Mr. Logan also shows the front

cross-piece intersecting, or crossing through, the front delimitation of the plane of contact when

he assumes that the ski tip is the front of skid (as is proper).  In the figure below from his expert

report, the front delimitation of the plane of contact is indicated by the dotted line on the right,

and the front cross-piece intersects, or crosses through, it.



[Ex. 11, 4/26/13 Logan Report at 79]

> **b.** **Eurocopter's Assertion that the Production Gear's Front Cross-Piece Satisfies the "Offset" Limitation Is Contrary to the Court's Claim Construction**

Eurocopter, however, ignores that the descending branches of the front cross-piece

intersect the front delimitation of the plane of contact of the longitudinal support stretches.

Eurocopter accomplishes this through its improper identification of the skid as taking a detour up

the front crosstube upon reaching the front saddle joint.  Because he ignores the portion of the

skid in front of the saddle joint, Mr. Logan only identifies the plane of contact that is rearward of

the saddle joint as shown below, ignoring that the plane of contact continues farther forward:



[Ex. 11, 4/26/13 Logan Report at 78]

As shown below, Eurocopter ignores the plane of contact with the ground that exists between the orange and pink lines on the basis that that portion of the plane of contact is not part of what Eurocopter wants to call the skid.



[Based on Ex. 28, EC-DC 0004905]

Indeed, Mr. Logan's own opinion from the Canadian Action contradicts his identification of the front delimitation of the plane of contact here.  In the Canadian Action, Mr. Logan identified the front delimitation of the plane of contact to be forward of the front saddle joint connection, represented by the vertical dashed line on the right, as follows:



[Ex. 23, 8/31/10 Logan Canadian Expert Report at 77]

As discussed *supra*, Mr. Logan also identified the front delimitation of the plane of contact in the same manner in this case when he assumed that the ski tip is the front of the skid.  Ex. 11, 4/26/13 Logan Report at 79 (¶ 200).

Mr. Logan's only basis for offering an alternative opinion regarding the front delimitation of the plane of contact now is his absurd re-definition of the skid to include a portion of the front cross-piece, ignoring the portion of the skid tube in front of the saddle joint.  Mr. Logan only opines that his limitation is met literally; he offers no opinion under the doctrine of equivalents.

35

Ex. 11, 4/26/13 Logan Report at 69-79 (¶¶ 185-200) (only alleging equivalents concerning "curvature" and "front"); Ex. 25, 6/5/13 Logan Tr. at 121:3-7; *see Am. Calcar Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1338-39 (Fed. Cir. 2011) (doctrine of equivalence evidence "must be presented on a limitation-by-limitation basis"). Eurocopter has never alleged that this limitation is met under the doctrine of equivalents. Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 15-17. In any event, it is impossible to envision a doctrine of equivalents argument that would not vitiate the Court's construction, which precludes the front cross-piece from intersecting the front delimitation of the plane of contact.

### c. Eurocopter's Alternative Position that the Production Gear's Front Cross-Piece Satisfies the "Offset" Limitation Using the Proper Front Delimitation of a Plane of Contact Also Fails

Mr. Logan also offers an alternative theory that the front cross-piece of the Production Gear literally satisfies the "offset" limitation even using the proper location of the front delimitation of a plane of contact. Ex. 11, 4/26/13 Logan Report at 78-79 (¶ 200). Mr. Logan's alternative theory is also predicated on treating the descending branches of the front crosstube as part of the skid. His diagram below shows that the descending branches of the front crosstube intersect the front delimitation of the plane of contact, which is shown by the dotted line on the right.



[Ex. 11, 4/26/13 Logan Report at 79]

However, according to Mr. Logan's absurd re-definition of the skid, the descending branches of the front cross-piece are not part of the front cross-piece. As previously discussed, he asserts that

the front cross-piece only includes the portion of the Production Gear identified in red in the below figure.



[Ex. 11, 4/26/13 Logan Report at 77]

Since he has declared the descending branches which intersect the front delimitation of the plane of contact not to be part of the front cross-piece, Mr. Logan opines that the "offset" limitation remains literally satisfied.

This argument fails, because as detailed above, no reasonable jury could accept the Eurocopter's litigation induced redefinition of the skid (in yellow above), where the skid takes a detour up the front crosstube and the ski tip of the skid tube is ignored. *See supra* Section IV.A.1.b.  Because the descending branches of the front cross-piece must be considered part of the front cross-piece, the Production Gear cannot satisfy the "offset" limitation, and this is yet another grounds for summary judgment of non-infringement.

### B.    The Unasserted Claims are Not Infringed as a Matter of Law

Eurocopter made no contention and has offered no fact or expert evidence to allege that the accused products infringe claims 4-8, 11-14 or 16 of the '621 Patent.  Eurocopter's infringement contentions and expert report only address claims 1-5, 9-10 and 15.  Ex. 6, Eurocopter's 8/27/12 Infringement Contentions at 1-22; Ex. 11, 4/26/13 Logan Report at 5 (¶¶ 22, 24).  Accordingly, Bell Helicopter is entitled to summary judgment that claims 4-8, 11-14

and 16 are not infringed.  *See Celotex*, 477 U.S. at 325 (it is proper to grant summary judgment

on the basis that there is insufficient evidence supporting an element on which the nonmovant

bears the burden of proof).

    **C.**    **Eurocopter is Barred from Recovering any Damages with Respect to the Production Gear for the Period Prior to the Filing of Its Infringement Counterclaim, and Cannot Recover any Damages with Respect to the Legacy Gear**

Under 35 U.S.C. § 287(a), Eurocopter is not entitled to any pre-suit damages for either

the Production Gear or the Legacy Gear, because Eurocopter failed to mark its own products

covered by the '621 Patent and did not provide actual notice of its infringement allegations prior

to filing its infringement counterclaim in this action.  Additionally, Eurocopter is barred from

recovering any damages with respect to the Legacy Gear, even for the period after it filed its

counterclaim, because there is no evidence that Bell Helicopter has committed any infringing act

with the Legacy Gear in the United States after filing its counterclaim.

    **1.**    **Eurocopter Failed to Provide Notice to Bell Helicopter in Compliance With Section 287 Before This Action Began**

Eurocopter contends that the landing gears of its model EC120 and EC130 helicopters are

covered by the claims of the '621 Patent.  *See* Eurocopter's 10/29/10 Answer and Counterclaim,

D.I. 15, at 9 (¶ 7); Ex. 13, Eurocopter's 3/17/11 Interrogatory Responses at 7 (Response to Rog.

No. 6); Ex. 14, Eurocopter's 2/28/13 Interrogatory Responses at 9-10 (Response to Rog. No. 22).

However, Eurocopter has not complied with 35 U.S.C. § 287 by marking the '621 Patent number

on the landing gear of the EC120 and the EC130 helicopters.  *See* Ex. 15, Eurocopter's 11/30/12

Interrogatory Responses at 8 (First Supp. Response to Rog. No. 11 ("Eurocopter has not marked

products with the patent number of the Patent-in-Suit.")).  In addition, Eurocopter did not

provide any actual notice of alleged infringement of the '621 Patent to Bell Helicopter until

October 29, 2010, when Eurocopter filed its counterclaim for infringement.[3]  Eurocopter's

10/29/10 Answer and Counterclaim, D.I. 15, at 11 (¶ 19); Ex. 16, Bell Helicopter's 3/29/13

Interrogatory Responses at 73-74 (Second Sup. Response to Rog. 9).  Therefore, Eurocopter is

not entitled to recover damages for any alleged infringement that occurred prior to October 29,

2010.  *See Amsted Indus. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994).

>    **2.      Eurocopter Is Barred From Recovering any Damages with Respect to Alleged Infringement by the Legacy Gear**

With respect to its allegations of infringement against the accused Legacy Gear,

Eurocopter does not, and cannot, allege that Bell Helicopter committed any acts of infringement

with the Legacy Gear in the United States after this action was initiated.  Shortly after

Eurocopter filed the Canadian Action in 2008, Bell Helicopter changed the design of the landing

gear on the Bell 429 from the Legacy Gear to the Production Gear.  Ex. 1, 3/14/13 Gardner Tr. at

73:22-76:11; Answer, D.I. 15, at 10 (¶ 15); Ex. 2, Canadian Opinion at 10 (¶ 22).  Bell

Helicopter obtained certification for the Production Gear's use on the Bell 429 from the relevant

aviation authorities in Canada, the United States and Europe in 2009.  Ex. 3, 1/21/11 Canadian

Tr. Vol. 5 (Gardner) at 6:16-22.  The Legacy Gear has not been certified, so Bell Helicopter

cannot sell a Bell 429 helicopter having the Legacy Gear.  Ex. 1, 3/14/13 Gardner Tr. at 73:22-

---

[3] Eurocopter wrongly contends that the filing of the Canadian Action constitutes notice of Eurocopter's infringement contentions with respect to the '621 Patent because notice with respect to a related patent was conferred at that time.  But "the actual notice requirement of § 287(a) is satisfied when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement."  *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997); *see Holdt v. A-1 Tool Corp.*, No. 04 C 4123, 2010 WL 1980101, *6 (N.D. Ill. May 17, 2010) (finding notice insufficient as a matter of law where asserted patent was not identified).  Eurocopter did not inform Bell Helicopter in the Canadian Action of the '621 Patent or that any act could constitute an act of infringement with respect to the '621 Patent, and identifies no evidence that it did so.  Ex. 15, Eurocopter's 11/30/12 Interrogatory Responses at 7-8 (First Supp. Response to Rog. No. 10).

74:8 (Legacy Gear never certified); 249:8-253:21 (same); 295:9-297:7 (testifying that Bell 429 cannot be sold with potential alternative landing gear without first obtaining certification).

There is no dispute that after October 29, 2010, every Bell 429 Helicopter that has been made, used, sold or offered for sale in the United States includes the Production Gear, not the Legacy Gear.  Ex. 3, 1/21/11 Canadian Tr. Vol. 5 (Gardner) at 5:20-6:22.  Indeed, in response to an interrogatory requesting Eurocopter to "describe in detail the specific acts of infringement that [Eurocopter] allege[s] Bell Helicopter engaged in with respect to each of the accused [Legacy] Gear and the [Production] Gear . . . including an identification of when such acts occurred [and] where such acts occurred," Eurocopter did not identify any alleged act of infringement with the Legacy Gear after October 29, 2010.  Ex. 14, Eurocopter's 2/28/13 Interrogatory Responses at 8-9 (only citing newsletter about Bell 429 from April 2008 and from September 2007 (newsletters attached as Ex. 17 and Ex. 18 respectively)); *see also* Ex. 25, 6/5/13 Logan Tr. at 154:3-157:13 (Mr. Logan was unable to point to any alleged acts of infringement concerning Legacy Gear after 2009 certification).

Accordingly, Bell Helicopter respectfully requests that the Court grant summary judgment that Eurocopter is not entitled to recover any damages in connection with its claim of infringement by the Legacy Gear.  *Loops, LLC v. Phoenix Trading, Inc.*, No. C08-1064 RSM, 2010 WL 3041866, at *4-5 (W.D. Wash. Jul. 30, 2010) (granting summary judgment that patentee was not entitled to any damages for failing to mark its products where all of the accused activity was done before the patentee had provided actual notice of the patent); *Bernardo Footwear, L.L.C. v. Fortune Dynamics, Inc.*, No. H-07-0963, 2008 WL 154461, at *2-3 (S.D. Tex. Jan. 15, 2008) (summary judgment granted, dismissing damages claim for failing to comply with the marking statute where the accused infringer ceased to sell accused product in September

2006, before it received actual notice from the patentee in 2007, and the patentee could not

demonstrate compliance with marking statute).

>    **D.**    **Summary Judgment Should Be Granted That Eurocopter is Not Entitled to Injunctive Relief With Respect to the Legacy Gear**

Eurocopter also is not entitled to injunctive relief with respect to the Legacy Gear.  As

detailed above, it is undisputed that ***Bell Helicopter has never sold a helicopter with a Legacy***

***Gear, and cannot do so*** because the Legacy Gear has never been certified by the relevant

aviation authorities.  Ex. 1, 3/14/13 Gardner Tr. at 73:22-74:8, 249:8-253:21, 295:9-297:7; Ex. 3,

1/21/11 Canadian Tr. Vol. 5 (Gardner) at 5:20-6:22.  Indeed, upon learning of Eurocopter's

claims of infringement of its Canadian '787 Patent in 2008, Bell Helicopter ceased its efforts to

use the Legacy Gear on the Bell 429 Helicopter.

The Production Gear is the only landing gear that has been certified by the relevant

aviation authorities for use with the Bell 429 helicopter.  Eurocopter has cited no evidence of

Bell Helicopter making, using, selling, or offering for sale any helicopters with a Legacy Gear in

the United States since Bell Helicopter obtained certification for the Production Gear in 2009.

*See* Ex. 14, Eurocopter's 2/28/13 Interrogatory Responses at 8-9; Ex. 25, 6/5/13 Logan Tr. at

152:16-153:7 (conceding that Bell is not certified to sell helicopter with Legacy Gear, and that he

had not seen any sales document regarding Legacy Gear), 154:3-157:13 (unable to point to any

alleged acts of infringement concerning Legacy Gear after 2009 certification); *see also* Ex. 3,

1/21/11 Canadian Tr. Vol. 5 (Gardner) at 5:20-6:22; Ex. 1, 3/14/13 Gardner Tr. at 73:22-74:8,

249:8-253:21, 295:9-297:7.

The irreparable harm requirement for obtaining a permanent injunction cannot be

satisfied in circumstances where, as here, the accused infringing product has never been sold, has

not even been manufactured in years, and the accused infringer is not reasonably capable of

resuming its use.  *See Unicom Monitoring*, 2013 WL 1704300 at *10; *see also Respironics*, 2008 WL 111983 at *2, 6; *Allan Block*, 634 F. Supp. 2d at 989-90; *Nichia*, 2008 WL 346416 at *2. Because Eurocopter cannot demonstrate the requisite irreparable harm to obtain injunctive relief against the Legacy Gear as a matter of law, Bell Helicopter respectfully requests that the Court grant summary judgment against Eurocopter's claim for injunctive relief in connection with the Legacy Gear.

## V.    CONCLUSION

Bell Helicopter respectfully requests that the Court grant summary judgment that (1) the Production Gear does not infringe any claims of the '621 Patent; (2) Eurocopter is not entitled to any pre-suit damages under 35 U.S.C. § 287; (3) Eurocopter is not entitled to any damages with respect to the Legacy Gear; and (4) Eurocopter is not entitled to injunctive relief against the Legacy Gear.

Because Eurocopter's counterclaim only seeks damages and injunctive relief for alleged infringement by the  Bell 429 with the Legacy and Production Gears, summary judgment that the Production Gear does not infringe and that Eurocopter is not entitled to damages and injunctive relief concerning the Legacy Gear would entirely dispose of Eurocopter's counterclaim. Regardless of the outcome of Bell Helicopter's motion, the Court will retain jurisdiction to consider Bell Helicopter's claim of invalidity of the '621 Patent.

Dated:  June 7, 2013

Respectfully submitted,

/s/ Jennifer A. Albert

Michael S. DeVincenzo (admitted *pro hac vice*)
Charles Wizenfeld (admitted *pro hac vice*)
Timothy J. Rousseau (admitted *pro hac vice*)
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018
Tel: (212) 813-8800
Fax: (212) 355-3333
mdevicenzo@goodwinprocter.com
cwizenfeld@goodwinprocter.com
trousseau@goodwinprocter.com

Jennifer A. Albert (DC Bar No. 397235)
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC 20001
Tel: (202) 346-4331
Fax: (202) 346-4444
jalbert@goodwinprocter.com

Charles H. Sanders (admitted *pro hac vice*)
Michael Strapp (admitted *pro hac vice*)
GOODWIN PROCTER LLP
53 State Street
Boston, MA 02109
Tel: (617) 570-1315
Fax: (617) 523-1231
csanders@goodwinprocter.com
mstrapp@goodwinprocter.com

*Attorneys for Plaintiff*
*Bell Helicopter Textron Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 7, 2013.

<u>/s/ Jennifer A. Albert</u>
Jennifer A. Albert